Our first argument is in St. Clair-Hibbard v. American Finance Trust. So we've got Mr. Squitieri. Am I pronouncing that right? That's correct, Your Honor. Thank you. Okay. So, Mr. Squitieri, you've got 12 minutes total, three minutes you reserve for rebuttal. And let me just make sure that Mr. Doyle and Ms. Soloway are on the line. You're both here. Good morning. Yes. Good morning, Your Honor. Okay. All right. So we'll get to you in about a dozen minutes, but we'll begin with Mr. Squitieri. So you've got the floor, Mr. Squitieri. Thank you. Good morning, Your Honors. May it please the Court. Given the amount of time allotted, I'm going to skip any recitation of the procedural background, the summary of the complaint, the overview of the motions, and the decision itself. Referencing knows only where it's pertinent to the argument. So I'll get right to it. As you know, this is a Section 14 claim and a breach of fiduciary duty claim. The Section 14 claim arises out of a proxy for a merger. We contend that the proxy statement was materially misleading. Defendants claimed that there was adequate disclosure. The Court agreed with them. Both parties agree that the central issue on the proxy claim is whether it disclosed a risk that upon a public listing, the price of American finance would discount materially to reflect the fact that it was externally managed and that the external management was under the terms of the Third Advisory Agreement. Both parties also agree that the disclosures of that risk. The issue, thus, is whether the proxy statement was materially false and misleading due to the failure to disclose a specific risk. And by specific, I mean specific that there is a risk of a material discount upon public listing, material discount from the net asset value, which at the time was in the 20s. As we know from references in the record, that upon the public listing in July 2018, the stock opened down about 37, 38 percent below... Excuse me. You have one more minute. ...net asset value. So defendants argue that the proxy statement was adequate because it gave disclosure of what it calls the internalization fee that was a component of the Third Advisory Agreement. They say that the formula was provided. They and the Court both said that the formula was high and the proxy specifically disclosed that that would have an effect on the premium if there were ever a takeover. The Court said that implicit in those disclosures was inadequate disclosure that there was a risk of a material discount upon the public listing due to the external management structure. We say that the specific disclosure should have been at least as specific as that which a related company gave to its shareholders, which we note at paragraph 37 in the amended complaint, which is in the record, wherein they specifically disclosed that markets and investors discount an externally managed property REIT upon a public listing. That's where the same cast of characters and actors in that company and in that disclosure as are here. So that is our contention as to what should have been disclosed, what was not disclosed. We say that the warnings, the so-called warnings, were much too generic and much too vague to constitute any clear and specific warning as required under the law. We say that... Let's pause there because we're about at the four-minute mark, so I want to give the judges an opportunity to ask some questions. Judge Calabresi, do you have any questions for Mr. Squitieri? Yes. Here is my problem. You actually brought suit before there was any market loss, and you said in your brief that that was okay because it was so clear that the loss would take place. But if that is so, isn't that a pretty clear suggestion that the warning was already there, that the thing was already known? If you could bring suit before the loss, isn't that a sign that what they told you was enough to give you all that you needed to know about this risk? No, Your Honor, it was not, because while we take a stab at what was omitted and what was materially false and misleading, it's not known with enough concreteness and specificity. Of course, before you have an actual loss, it's rather hard to say under very strict rules about what is a sufficient and what is not a sufficient prospectus. It just seems to me that there's a deep contradiction there, and to say, well, we sort of knew doesn't get to me. I'd like to know more about how you could bring the suit before you had an actual loss because you sort of knew that you were going to get it. Well, we sort of knew we were going to get it because we had the prior admission of these very same defendants with respect to another stock and company that they controlled, but it wasn't disclosed in the proxy, and information that is not in the proxy has not been held except in rare circumstances to cure nondisclosures or to make nondisclosures immaterial, especially at the pleading stage. But isn't it as likely that what is going on was that the various statements taken together amounted to the same thing, even though there wasn't one clear statement, that they're taken together, they amounted to the same thing? Well, Your Honor, that was the essence of the ruling in the court below, but this is a very, very complicated transaction and complicated issue. So the essence of the warnings, let's go to that question first. What were the warnings? The warnings were all generic. The warnings were all, we cannot guarantee where this will trade upon a public listing. The price may be higher or lower. If there is a takeover, we may get a lower premium. So taken all together, they're just generic disclosures. And what we have here is a complicated issue of the effect of external management upon a public listing with respect to a discounted net value. If the court will take note of my paragraph 37 in the complaint, admission that the same group of defendants made with respect to another stock is pretty technical. And the Virginia Bank shares case, which is a proxy case, of course, the Supreme Court at Glenn discussed what type of disclosure would put a shareholder on notice. And they specifically discussed the fact that if we take an analyst or a market professional to tease out what the implications could be, then that's not sufficient disclosure for the shareholder on a proxy claim. Thank you. Judge Wesley, do you have any questions for Mr. Scruteri? No, in light of Judge Calabrese's questions, I have none. Thank you. Do I have any time remaining, Your Honor? Sure. Yeah, go ahead. If you want to hit some other things, that's fine. I do want to get to the fiduciary breach claims. Now, in the court below, the fiduciary breach claims, by the way, arise not out of the relationship of the shareholder to the company, but of the shareholder to the defendant advisor, which is the external manager. And they are contractual in nature, and they are specifically set forth in the agreement, which is quoted in the complaint in the briefs in the court below. And that specific contractual undertaking says that the nature of the fiduciary duty arises out of relationship and the operation. The court below held that the fiduciary breach and the duties we were describing were beyond the scope of the contract because of the specific duties undertaken. We contend that was error because the contract says that the fiduciary responsibilities arise out of the relationship. It's a contractual undertaking. Therefore, we contend that it is... Could I ask you a question there? Yes. This is Judge Calabrese. And that is, did the fiduciary duty that you're claiming there arise out of the earlier management contract before this deal was arranged? And where in that contract, which is simply to manage, not to make this deal, would a fiduciary duty arise? Because if it only arose from the deal itself, there was no duty yet. There was no contract yet because of a deal. The deal hadn't been consummated. So I'd like to be a little clearer on when you think that this... Out of what do you think this fiduciary duty arose? Well, Your Honor, the fiduciary duty arose out of the advisory agreement. And the complaint details the evolution of the advisory agreement. There was an original one upon formation of the company. There was a second advisory agreement agreed and voted upon in 2015. And then there was the third advisory agreement that was voted on as part of the mojo. As we allege... Do they speak... Please. Do they speak to anything other than the management of the company? Or do they also go to any deals that the company might get into? Well, first, let me make the prior point very clear for the record. All three iterations of the advisory agreement had the fiduciary undertaking, I believe, at paragraph five. Now, did the contract extend to the dealmaking? The contract extends to all investments and all operations of the company. Okay. And the contract makes clear, and the proxy statement makes clear, the extent of the control of the advisor by virtue of the company over the operations, including administrative, including SEC filing... Mr. Squitieri, this Judge Wesley, did Appen have to do business with advisors or could have gotten a different advisor? External control... External management group. It could only have gotten a new advisor pursuant to the terms of termination in advisory agreement one, two, and three. No, well, the agreements were for terms, weren't they? Lengths of time? The agreements were for terms, but... And when the term expired, what happened then? Was Appen bound forever to advisors? Were they married forever? Well, they weren't married forever. So if Appen wanted to go and get somebody else to perform the task, they could have, correct? As of the second agreement, it was a non-cancellable 20-year renewable term. So... I understand. I know what it was. I'm asking you a question if they could have, at the end of it, they could have gone and done business with somebody else. At the end, yes. Okay, thank you. Thank you. All right, you've reserved three minutes for a rebuttal. So we'll now hear from Mr. Doyle, who's got seven minutes. Mr. Doyle, are you ready? Good morning. Yes, may it please the court. I'm Peter Doyle on behalf of Appellee American Finance Trust, Inc. I will address the Section 14 issues raised concerning my client Nathan's proxy disclosures. As Judge Calabresi noted, plaintiffs brought this claim before the shares were publicly listed, and they were able to make their allegations because those risks were well known. As Mr. Squitieri highlighted this morning, in his complaint, he notes that the industry discounted externally managed REITs. In fact, the complaint said in paragraph 35 that these disadvantages were well known, and in paragraph 38 that the disadvantages were obvious. Plaintiff attempts to fashion a claim under Section 14a of the Exchange Act by arguing that Nathan solicited votes for its merger by issuing false misleading proxy materials. But the third advisory agreement, and particularly those risks to Nathan's stocks, were fully disclosed, and any additional material was unnecessary to be disclosed. First, plaintiff defies logic in arguing that Nathan concealed when, under the third advisory agreement, it could internalize management functions. Nathan twice disclosed and filed the agreement itself. Nathan also comprehensively disclosed in detail the internalization terms in its proxy materials, including the formula for calculating that fee. And Nathan openly warned that internalization could harm its investment objectives and could discourage third-party acquisitions. As the district court held, a reasonable shareholder would have understood from those disclosures that the fee could be extremely high and could reduce the value of the shares upon listing. Second, plaintiff's allegation that Nathan failed to disclose the risks associated with external management. Excuse me. You have one more minute. Thank you. Ignores those prominent disclosures concerning those risks as noted in the complaint. Third, even if the supposed risks to Nathan's shares was not clear from those disclosures, any omission is plainly immaterial in light of the extensive warnings about the risks of external management as well known in the industry. At bottom, plaintiffs bought an externally managed wheat. That was the product. That was their decision. It posed inherent and well-known risks. In addition, this court may affirm for two independent reasons, not reached by the district court, plaintiffs failed to plead loss causation and its claims are untimely. I'll now pause for questions. Okay. Thank you. Judge Calabresi, do you have any questions for Mr. Doyle? I have no questions. Judge Wesley, do you have any questions? Nor do I. Nor do I. Thank you. I guess I would just ask you, Mr. Doyle, if you would respond to the fiduciary duty points that were teed up at the end of Mr. Skwitiri's presentation. Your Honor, my co-defendant's counsel, Ms. Soloway, will address those. Okay. That's great. I have no further questions. All right. Anything else you would like to say, since you do have some extra time, Mr. Doyle? I will return that to the court. Okay. Thank you. So, Ms. Soloway, we'll now hear from you. You've got five minutes total, three minutes of which will be uninterrupted, and you'll get a warning at the two-minute mark. Thank you, Your Honor. May it please the court, Audra Soloway from Paul Weiss, representing American Finance Advisors, AR Global, Mr. Schorsch, and Mr. Kahana. Your Honors, there are three claims against my clients, but like Mr. Skwitiri did, I will focus today on the breach of fiduciary duty claim that's asserted against Advisor. Now, the appellant's breach of fiduciary duty claim hinges on the contract between AFIN and Advisors, under which Advisors provide services to AFIN. The appellant is not alleging today that Advisor did a poor job in carrying out its or otherwise managing its responsibilities. Rather, what the appellant contends is that duties were breached when Advisor negotiated certain favorable terms for itself when it negotiated those contracts with AFIN's independent directors. The District Court properly dismissed this claim for two reasons. The first is that the contracts do not impose a duty on Advisors that predates the creation of the contract, and specifically the duty to create a contract with the least desirable terms for Advisors. Now, in reaching that conclusion, the District Judge considered whether, if Advisors had had the ability to dictate the terms of the Advisory Agreements, that would alter the outcome. And what the District Court concluded was that the appellant had not pleaded such control. To the contrary, both Advisory Agreements were approved by AFIN's independent directors with the one non-independent director abstaining. The agreements were also ratified by shareholder votes. And with respect to the third Advisory Agreement, that contract was negotiated during the merger by a special committee of the Board comprised only of independent directors who were advised by their own lawyers and financial advisors. So, while the appellant here is offering conclusory allegations that the Advisor somehow controlled AFIN's Board and the Board was not independent, the complaint actually lacks any well-pleaded factual allegations supporting that conclusion. There is a second alternative ground for dismissal. The District Court found that the breach of fiduciary duty claim is a derivative claim because the alleged harm here was suffered by AFIN and not by its shareholders. And as a result, the plaintiff lacks standing to pursue derivative claims. This ruling as well is plainly correct. If AFIN overpaid advisors for its services, which is the thrust of appellate's contention, that is harm to AFIN, the REIT, not to its shareholders. Now, the appellant has suggested in response that the shareholders also suffered a direct injury because voting rights were somehow impaired. But the appellant hasn't identified any injury to voting rights that was committed by the advisor. And certainly, the appellant hasn't cited any cases that apply the theory that a third party service provider to an issuer can be subject to a direct claim by shareholders for the alleged impairment of a voting right by that issuer. This is a quintessential derivative claim where the alleged harm is clearly that AFIN overpaid for services and the District Court, therefore, can be affirmed on that basis as well. With respect to the additional arguments that we've presented in our papers as grounds for dismissal, I'll rest on the papers. Thank you very much, Your Honors. Okay. Let's see if we have questions from the panel. Judge Calabresi, any questions for Ms. Soloway? I have no questions. Thank you. All right. And Judge Wesley, do you have any questions of Ms. Soloway? No, thank you very much. Okay. Neither do I. Then thank you, Ms. Soloway. We'll now hear from Mr. Squitieri, who has three minutes of rebuttal time. Thank you, Your Honors. I'll address two brief points, one on the proxy, one on the breach of fiduciary duty claim. On the proxy claim, a trust counsel hammered the point that full disclosure was made. Everybody knew it. I had enough to frame the complaint. But at the pleading stage and on a motion to dismiss, what I pleaded is enough. And there was not enough for the court to make a factual conclusion that the omitted information was, in fact, fully known and appreciated at the time the proxy was issued. Those are questions for a later stage in the case. Well, what about the statements in the complaint that sort of talked about the disadvantages being well-known and obvious? They are well-known and obvious in an abstract sense, but not in this particular case. And that makes all the difference in the world, given the complexity of the transaction. But what does it mean to be well-known in an abstract sense? Well, in the sense that externally managed firms will sometimes trade at a discount. And if that is so, then the only thing you asked for them to say was that externally managed firms are exceptionally risky. That's a specific thing that was in the other statement, the other merger that you referred to, and is not here. But that's exactly the abstract thing that you're saying now. I don't understand how what you want isn't what you already say you know. I respectfully disagree, Your Honor, because the statements in the proxy and the warnings the law has held repeatedly have to be specific, have to be tied to the issue, and the disclosures at hand. General information... But your reason for bringing it before the stock had even gone public was that there was a general understanding. You cite to a Moody's report. You say the industry has generally agreed to understand this. And that's your basis. Because it's generally known, that's your basis for pleading in advance. But if it's generally known, then why is there a requirement to disclose it? There's no guarantee that the stock was going to go down. It's just generally known that this can happen. Well, if it's generally known, then why does it have to be disclosed? Because proxy statements require specific disclosures. The proxy didn't have to guarantee that it was going to go down, did it? No, it did not. But it had to... What was the proxy supposed to say? Exactly what was said at paragraphs 34 through 36 of your complaint? That there's a general awareness that this could happen? And more, that this agreement itself and the revisions would present the material risk of a material discount upon the public... And the risk was disclosed in terms of the nature of the substantial costs that were going to be incurred if there was internalization, wasn't there? They were able to calculate it. They were able to look at it. No, a shareholder would not calculate that based on the complexity of the formula, Your Honor. Okay, okay. And that, in essence, is their argument. Now, getting to the fiduciary breach, counsel for the advisors indicated in her argument that the advisor had no sufficient control over the process, that the third advisory agreement was negotiated at arm's length. In our complaint of paragraphs 41 and 63, we detailed the fact that there was no special committee, that the financial advisor to the special committee disqualified itself from any analysis of the financial effect, and that both the trust and the advisor were represented by the same counsel, which I believe was Proskauer. So it was not a situation of independent arm's length. It was a situation where advisors, in effect, controlled the transaction. The complaint alleges that it was advisors, excuse me, that it was advisors that demanded that in connection with the merger, the second advisory agreement be amended into the third advisory agreement. And the proxy statement says that- Is it your view that advisors manipulated the board or defrauded the board in some way or controlled the board? Is that your allegation? Yes, that they dominated- Then is that not a quintessential derivative claim? And how do you have standing to bring that claim? We have standing- Under New York law? Under any law, we have standing because it affected our voting rights. Well, all derivative claims, all affect the value of stock because it's an injury to the corporation. Therefore, the corporation is devalued in some way, causes an injury, and cause an injury to the stockholders. But that's the nature of any derivative claim, isn't it? Well, that is, but the claim also- So your response doesn't answer the question as to why isn't this a derivative claim? How does it differ from a classic derivative claim? Because quintessential direct claims are injury to franchise and dilution to the stockholders. This isn't an injury directly to your client, it's an injury to your client as a result of the devaluation of the corporation because of the hugeness of the fee. That's your theory. Your Honor, that's one of the allegations. But the allegations for direct injury as opposed to derivative are based on classic hallmarks of direct injury. A defective proxy that adversely affects the franchise right has always been held to be a direct injury. Now you're going back to the proxy. The proxy, right. I was talking about the fiduciary. I thought that you were arguing about the fiduciary duty. I am, Your Honor, but the fiduciary, in this case, advisors, control the proxy as a result of the contractual right to make the SEC filings and draft them on behalf of the trust. All right. So are you saying, Mr. Scruteri, that if we don't buy your proxy claim, then your fiduciary duty claim goes with it? Is that what you're saying? No. Okay. There are multiple bases upon which the fiduciary duty claim and breach. And they arise out of the broad scope of duties tendered to the advisor under the contract. Well, we're already at almost the eight-minute mark, so we will pause here. We'll reserve decision. Thank you all.